UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

_____

| | | |
|---|---|---|
| TOWN OF MAYSVILLE, | ) | MDL No.: 2873 |
| | ) | Master Docket No.: 218-mn-2873 |
| Plaintiff, | ) | |
| | ) | JUDGE RICHARD GERGEL |
| vs. | ) | |
| | ) | Civil Case No.: 2:19-cv-3434-RMG |
| 3M COMPANY (f/k/a Minnesota | ) | |
| Mining and Manufacturing, Co.); E.I. DU PONT | ) | |
| DE NEMOURS & COMPANY; THE | ) | |
| CHEMOURS COMPANY; THE CHEMOURS | ) | |
| COMPANY, FC, LLC, CHEMGUARD, INC., | ) | |
| TYCO FIRE  PRODUCTS, LP; | ) | |
| ANSUL COMPANY; | ) | DIRECT FILED COMPLAINT |
| KIDDE-FENWAL, INC.; NATIONAL FOAM | ) | AND JURY DEMAND |
| INC.; ANGUS FIRE ARMOUR CORPORATION | ) | PURSUANT TO CASE |
| BUCKEYE FIRE EQUIPMENT COMPANY; | ) | MANAGEMENT ORDER NO. 3 |
| and JOHN DOE DEFENDANTS 1-49 | ) | |
| | ) | |
| Defendants. | ) | |

_____

## **COMPLAINT**

Plaintiff Town of Maysville, North Carolina ("Maysville" or "Plaintiff"), by and through

its undersigned counsel, brings this action against Defendants 3M Company, E. I. DuPont De

Nemours and Company, The Chemours Company, The Chemours Company, FC, LLC,

Chemguard, Inc., Tyco Fire Products, LP, Ansul Company, Kidde-Fenwal, Inc., National Foam

Inc., Angus Fire Armour Corporation, Buckeye Fire Equipment Company, and John Doe

Defendants 1-49 (collectively, "Defendants"), and alleges as follows:

## I.    **SUMMARY OF THE CASE**

1.    Plaintiff brings this action against Defendants to recover any and all past and

future compensatory and/or consequential damages for the investigation, remediation, removal,

disposal, and monitoring of the ongoing contamination of its surface, groundwater, soil, and

sediment caused and/or created by Defendants' products, as well as any and all punitive damages available as a result of the actions and/or inactions of Defendants.

2.      Maysville owns and/or operates at least one drinking water well that supplies water to residences, schools, and businesses in the community.

3.      Maysville's water supply is contaminated with per- and polyfluoroalkyl substances ("PFAS") including, but not limited to, perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonic acid ("PFOS") and/or perfluorohexane sulfonic acid ("PFHxS"). Maysville seeks to recover by this action the substantial costs necessary to protect the public and restore its damaged drinking water supply wells that have been, and continue to be, contaminated by PFAS --- including, but not limited to, those identified here.

4.      At various times from the 1960s through today, Defendants manufactured, marketed, and/or sold PFAS or products made with PFAS including Teflon, Scotchguard, waterproofing compounds, stainproofing compounds, paper and cloth coatings, waxes, and various other products.  One product is aqueous film-forming foam ("AFFF"), a firefighting agent used to control and extinguish Class B fuel fires.

5.      Defendants' AFFF contained PFAS, specifically, perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonic acid ("PFOS") and/or perfluorohexane sulfonic acid ("PFHxS"), and/or contained the precursors of these compounds.

6.      PFAS are manufactured compounds that are toxic and persistent in the environment, do not biodegrade, move readily through soil and groundwater, and pose a significant risk to human health and safety.

7.      Defendants manufactured, marketed and/or sold PFAS with the knowledge that these toxic compounds would be released into the environment during the intended use of

products made with PFAS even when the PFAS and end products were used as directed and intended by the manufacturer.

8.      At all relevant times, beginning decades ago and, upon information and belief, continuing to this date, PFAS-containing products were sold, supplied, used, and disposed in the vicinity of Maysville water wells and water supplies.  During these activities, PFAS-containing products were used as directed and intended by the manufacturers, which allowed PFAS compounds to enter the environment.  When used and disposed as intended, these compounds migrated through the soil and into the groundwater, thereby contaminating Plaintiff's water supply.

9.      Defendants manufactured, marketed and/or sold AFFF with the knowledge that these toxic compounds would be released into the environment during fire protection, training, and response activities even when the AFFF was used as directed and intended by the manufacturer.

10.     At all relevant times, beginning decades ago and, upon information and belief, continuing to this date, AFFF containing PFAS has been used and stored at fire training facilities, airports, and military bases for fire protection, training, and response activities.  During these activities, AFFF was used as directed and intended by the manufacturers, which allowed PFAS to enter the environment.  When sprayed onto outdoor surfaces as intended, these compounds migrated through the soil and into the groundwater, thereby contaminating Plaintiff's water supply.

11.     As a result of the use of PFAS-containing products, including AFFF and others, for their intended purposes, Maysville has detected three discrete PFAS chemicals (PFOS, PFOA, and PFHxS) in its water supplies and wells.

12.     Plaintiff files this lawsuit to recover compensatory and all other damages, including but not limited to the costs of designing, constructing, installing, operating and maintaining the treatment facilities and equipment required to comply with state and federal safe drinking water laws and to remove PFAS from the drinking water supplied to the public and/or for the costs of securing alternative sources of water as a result of the PFAS contamination, and to ensure that the responsible parties bear such expense, rather than Maysville and its ratepayers.

## II.     PARTIES

13.     The Town of Maysville was incorporated as a town in 1897.  Maysville is located in Jones County, North Carolina and is part of the New Bern, North Carolina Micropolitan Statistical Area.  Maysville owns and operates a public drinking water system that draws groundwater to provide potable drinking water to customers and visitors at homes, businesses, schools, public buildings, and churches in the town.

14.     Maysville has significant property interests in the groundwater it appropriates and uses, and also has significant property interests in the drinking water system that moves groundwater to the ultimate consumers.  The past, present and continuing contamination of such waters by PFAS constitutes injury to such waters for which Maysville is entitled to, and hereby does, seek damages and other appropriate relief.  All of Maysville's affected property interests, including its well(s), water supplies, water distribution infrastructure, soil, sediment, and water rights, will be referred to collectively in this Complaint as "Maysville Property" or "Plaintiff's Property."

15.     The following Defendants designed, manufactured, formulated, marketed, promoted, distributed, sold (directly or indirectly), applied, discharged, disposed of and/or

released the PFAS and/or products containing the PFAS that contaminates the Maysville

Property:

    a.   Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing

        Company) ("3M") is a corporation organized and existing under the laws of

        the State of Delaware and authorized to conduct business in North Carolina,

        with its principal place of business located at 3M Center, St. Paul, Minnesota

        55144.  3M has agreed to accept service of this Complaint via email in lieu of

        the formal requirements via 3M_service_AFFF_MDL@duffyandyoung.com.

        At all times relevant, 3M manufactured, marketed, promoted, distributed,

        and/or sold AFFF containing PFOA and/or PFOS used to fight fires at

        numerous military bases, airports, and other locations throughout the country.

    b.   3M is the only company that manufactured and/or sold AFFF containing

        PFOS.

    c.   Defendant E. I. DuPont De Nemours and Company ("DuPont") is a

        corporation organized and existing under the laws of the State of Delaware

        with its principal place of business located at 974 Centre Road, Wilmington,

        Delaware 19805.  DuPont has agreed to accept service of this Complaint via

        email in lieu of the formal requirements via:

        dupontchemoursservice@shb.com and mrushton@shb.com and

        mfwilliams@shb.com.  DuPont does and/or has done business throughout the

        United States, including in the state of North Carolina.

    d.   Defendant The Chemours Company ("Chemours") is a corporation organized

        and existing under the laws of the State of Delaware, with its principal place

of business located at 1007 Market Street, Wilmington, Delaware 19899. Chemours has agreed to accept service of this Complaint via email in lieu of the formal requirements via: dupontchemoursservice@shb.com and mrushton@shb.com and mfwilliams@shb.com. Chemours does business throughout the United States, including conducting business in North Carolina.

e. In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of PFAS compounds and products that contain PFAS compounds.

f. Defendant The Chemours Company FC LLC ("Chemours FC"), successor in interest to DuPont Chemical Solutions Enterprise, is a Delaware Corporation. Upon information and belief, Chemours FC conducts business throughout the United States, including the State of North Carolina. Its principal place of business is 1007 Market Street Wilmington, Delaware, 19899. Chemours FC has agreed to accept service of this Complaint via email in lieu of the formal requirements via: dupontchemoursservice@shb.com and mrushton@shb.com and mfwilliams@shb.com.

g. Defendant Chemguard, Inc. ("Chemguard") is a corporation organized and existing under the laws of the State of Texas, with its principal place of

business located at One Stanton Street, Marinette, Wisconsin 54143. Chemguard does business throughout the United States. Chemguard has agreed to accept service of this Complaint via email in lieu of the formal requirements via: mdlafff@jci.com and afffservice@wc.com. Upon information and belief, Chemguard does and/or has done business throughout the United States, including in the state of North Carolina. This Defendant manufactured and sold AFFF that contained PFOA.

h.  Defendant Tyco Fire Products LP ("Tyco") is a limited partnership organized and existing under the laws of the State of Delaware. Upon information Tyco is authorized to do business in North Carolina, and its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446. Tyco has agreed to accept service of this Complaint via email in lieu of the formal requirements via: mdlafff@jci.com and afffservice@wc.com. Tyco is an indirect subsidiary that is wholly owned by Johnson Controls International plc, an Irish public limited company listed on the New York Stock Exchange [NYSE: JCI].

i.  Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as The Ansul Company ("Ansul") (hereinafter, Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco/Ansul"). At all times relevant, Tyco/Ansul manufactured, marketed, promoted, distributed, and/or sold fire suppression products, including AFFF, that contained fluorocarbon surfactants containing PFAS.

j.  Defendant The Ansul Company (hereinafter "Ansul") is a Wisconsin corporation, with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

k.  Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at One Financial Plaza, Hartford, Connecticut 06101. Kidde-Fenwal is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire"). Kidde-Fenwal has agreed to accept service of this Complaint via email in lieu of the formal requirements via: KiddeDefendantsAFFF@daypitney.com. Upon information and belief, Kidde-Fenwal does business throughout the United States, including conducting business in North Carolina.

l.  Defendant National Foam, Inc. ("National Foam") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. National Foam manufactures the Angus brand of products and is the successor-in-interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire"). National Foam has agreed to accept service of this Complaint via email in lieu of the formal requirements via: smithkei@gtlaw.com. Upon information and belief, National Foam/Angus Fire does and/or has done business throughout the United States, including in the state of North Carolina. This Defendant manufactured and sold AFFF that contained PFOA.

m. Defendant Angus Fire Armour Corporation ("Angus Fire") is a Delaware

corporation, with its principal offices at 141 Junny Road, Angier, North

Carolina 27501. Upon information and belief, Angus Fire has appointed :

CSC- Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N,

Sacramento, CA 95833 as its agent for service of process.

Upon information and belief, Angus Fire does and/or has done business

throughout the United States, including conducting business in North

Carolina.

n. Defendant Buckeye Fire Equipment Company ("Buckeye") is a foreign

corporation organized and existing under the laws of the State of Ohio, with

its principal place of business at 110 Kings Road, Mountain, North Carolina

28086.  Buckeye does and/or has done business throughout the United States,

including conducting business in North Carolina.  Buckeye has agreed to

accept service of this Complaint via email and first class and certified mail in

lieu of the formal requirements via: mcarpenter@gastonlegal.com,

msingleton@gastonlegal.com and via regular mail to:

Michael L. Carpenter
Gray, Layton, Kersh, Solomon, Furr & Smith, P.A.
516 South New Hope Road
Post Office Box 2636
Gastonia, NC 28053.

This Defendant manufactured and sold AFFF that contained PFOA.

o. Upon information and belief, Defendants John Doe 1-49 were manufacturers

and/or sellers of PFAS and/or PFAS-containing products including AFFF.

Although the identities of the John Doe Defendants are currently unknown, it

is expected that their names will be ascertained during discovery, at which

time Plaintiff will move for leave of this Court to add those individuals' actual

names to the Complaint as Defendants.

16.    The foregoing Defendants, including the John Doe Defendants, all were

manufacturers and/or or sellers of PFAS and/or PFAS-containing products including AFFF who,

on information and belief, manufactured, distributed, and/or sold PFAS and/or PFAS-containing

products including AFFF that was used on or near the Plaintiff's Property.

17.    When the term "Defendants" is used alone, it refers to all Defendants named in

this Complaint jointly and severally.  Any and all references to a Defendant or Defendants in this

Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of

the named Defendants.  When reference is made to any act or omission of the Defendants, it

shall be deemed to mean that the officers, directors, agents, employees, or representatives of the

Defendants committed or authorized such act or omission, or failed to adequately supervise or

properly control or direct their employees while engaged in the management, direction,

operation, or control of the affairs of Defendants, and did so while acting within the scope of

their employment or agency.

### III.    JURISDICTION AND VENUE

18.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because complete

diversity exists between Plaintiff and Defendants, and the amount in damages exceeds the

minimal jurisdictional limits of this Court.

19.    This Court has jurisdiction over Defendants because, based on information and

belief, each is a corporation or other business that has sufficient minimum contacts in North

Carolina, or otherwise intentionally avails itself of the North Carolina market either through the

distribution or sale of products containing PFAS in the State of North Carolina or by having a manufacturing, distribution or other facility located in North Carolina so as to render the exercise of jurisdiction over it by the North Carolina courts consistent with traditional notions of fair play and substantial justice.

20.     Venue is appropriate in this judicial district pursuant to this Court's Case Management Order No. 3 ("CMO 3").  Plaintiff states that but for CMO 3 permitting direct filing in the United States District Court for the District of South Carolina, Plaintiff would have filed this Complaint in the United States District Court for  Eastern District of North Carolina. Further, in accordance with CMO 3, Plaintiff hereby designates the United States District Court for the Eastern District of North Carolina as the "Home Venue" as this case may have originally been filed there.

21.     Venue is proper in the United States District Court for the Eastern District of North Carolina pursuant to 28 U.S.C. § 1391 because it is the judicial district in which Plaintiff is a resident and citizen, a substantial part of the property that is the subject of this action is situated in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## IV.    FACTUAL ALLEGATIONS

### A.    THE CONTAMINANTS: PFOA & PFOS

22.     PFOA, PFOS, and PFHxS are chemicals within a class known as perfluoroalkyl acids ("PFAAs").  PFAAs are part of a larger chemical family known as per- and polyfluoroalkyl substances ("PFAS").  PFAA is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional

group.  The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature which is why these molecules are so persistent and bioaccumulate.

23.    PFAAs are sometimes described as long-chain and short-chain, depending on the number of carbon atoms contained in the carbon chain.  PFOA and PFOS are considered long-chain PFAAs because they each have eight carbon atoms in their chains.

24.    PFAS do not occur in nature.  Rather, they are stable, man-made chemicals.  They are highly water soluble, persistent in the environment and resistant to biologic, environmental, or photochemical degradation.  Because these compounds are water soluble and do not readily adsorb to sediments or soil, they tend to stay in the water column and can be transported long distances.

25.    PFAS are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver.  They have been found globally in water, soil, and air as well as in human food supplies, breast milk, umbilical cord blood, and human blood serum.[1]

26.    PFAS are persistent in the human body and resistant to metabolic degradation.  A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[2]

27.    Since they were first produced, information has emerged showing negative health effects caused by exposure to PFAS.

---

[1] *See* Agency for Toxic Substances and Disease Registry, Per- and Polyfluoroalkyl Substances and Your Health, available at https://www.atsdr.cdc.gov/pfc/health_effects_pfcs.html;  see also EPA, Long-Chain Perfluorinated Chemicals (PFCs) Action Plan (December 2009), available at .  https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/long-chain-perfluorinated-chemicals-pfcs-action-plan.

[2] *See* EPA, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA), EPA Document Number: 822-R-16-005 (May 2016) at 55; Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS), EPA Document Number: 822-R-16-004 (May 2016) at 55, both available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

28.     Specifically, according to the EPA, "… studies indicate that exposure of PFOA and PFOS over certain levels may result in…developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes)."[3]

29.     The EPA has also warned that there is suggestive evidence of the carcinogenic potential for PFOA and PFOS in humans.[4]

30.     The EPA has noted that "drinking water can be an additional source [of PFOA/PFOS in the body] in the small percentage of communities where these chemicals have contaminated water supplies."  In communities with contaminated water supplies, "such contamination is typically localized and associated with a specific facility, for example […] an airfield at which [PFOA/PFOS] were used for firefighting."[5]

31.     No federal or state agency has approved PFAS as an additive to drinking water. No federal or state agency has approved releasing or discharging PFAS to groundwater.

32.     The North Carolina Department of Environmental Quality has set an Interim Maximum Allowable Concentrations (IMAC) under 15A NCAC 02L .0202 for PFOA.  That value is 2 micrograms per liter ("2 ug/L," which is the equivalent of 2 parts per billion or "2 ppb").

_____

[3] *See* "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos; s*ee also* ATSDR, Per- and Polyfluoroalkl Substances (PFAS) and your Health, available at https://www.atsdr.cdc.gov/pfas/health-effects.html.
[4] *See* "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)" U.S. Environmental Protection Agency Office of Water Health and Ecological Criteria Division, EPA Document Number: 822 R-16-002, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.
[5] *See* "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

33.     PFOS and/or PFOA are primary components of PFAS and AFFF.

**B.     THE PRODUCT: PFAS-CONTAINING PRODUCTS**

34.     PFAS are used to make a variety of consumer and industrial goods sold, supplied, used, and disposed of in the State of North Carolina.

35.     PFAS are used, for example, in nonstick cookware, waterproofing waxes, stain-preventing coatings, and aqueous film-forming foams ("AFFF") used for firefighting.

36.     When used as intended, PFAS escape these products and enter into the environment.

37.     Once PFAS are free in the environment they do not hydrolyze, photolyze, or biodegrade under typical environmental conditions, and they are extremely persistent in the environment.  As a result of their persistence, they are widely distributed throughout soil, air, and groundwater.

38.     The use of PFAS-containing products as directed and intended by the manufacturers allowed PFAS compounds to enter into and onto Plaintiff's Property where these compounds migrated through the subsurface and into the groundwater, thereby contaminating the surface, soil, sediment and groundwater, as well as causing other extensive and ongoing damage to Plaintiff's Property.

39.     Due to the chemicals' persistent nature, among other things, these chemicals have, and continue to, cause injury and damage to Plaintiff's Property.

**C.     THE PRODUCT: AQUEOUS FILM-FORMING FOAM**

40.     AFFF is a water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports, among other places.

41.     The AFFF made by Defendants contained one or more of the PFAS compounds including PFOA, PFHxS, and/or PFOS.

42.     The AFFF produced, marketed, and/or sold by 3M was the only AFFF produced from fluorochemicals manufactured through electrochemical fluorination ("ECF"), a process that generates PFOS.  All other Defendants used telomerization to produce AFFF.  Fluorochemicals synthesized through telomerization degrade into PFOA, but not PFOS.

43.     AFFF can be made without PFOA and PFOS.  Fluorine-free foams do not release PFAS into the environment.  Despite knowledge of this fact as well as knowledge of the toxic nature of AFFF made with PFAS, defendants continued to manufacture, distribute and/or sell AFFF with PFAS which led to the ongoing contamination and damages on Plaintiff's Property.

44.     AFFF is used to extinguish fires, particularly fires that involve petroleum or other flammable liquids.  AFFF is typically sprayed directly onto a fire, where it then works by coating the ignited fuel source, preventing its contact with oxygen, and suppressing combustion.

45.     When used as the Defendants intended and directed, AFFF releases PFAS into the environment.

46.     Once PFAS are free in the environment they do not hydrolyze, photolyze, or biodegrade under typical environmental conditions, and they are extremely persistent in the environment.  As a result of their persistence, they are widely distributed throughout soil, air, and groundwater.

47.     Defendants' AFFF-containing PFAS has been used for its intended purpose in the process of fire protection, training, and response activities for many years.  During these activities, AFFF was used as directed and intended by the manufacturer, which allowed PFAS to enter into and onto Plaintiff's Property where these compounds migrated through the subsurface

and into the groundwater, thereby contaminating the surface, soil, sediment and groundwater, as well as causing other extensive and ongoing damages.

48.     Due to the chemicals' persistent nature, among other things, these chemicals have, and continue to, cause injury and damage to Plaintiff's Property.

## C.    DEFENDANTS' KNOWLEDGE OF PFOA AND PFOS HAZARDS

49.     On information and belief, by the 1970s, Defendants knew, or reasonably should have known, among other things, that: (a) PFAS are toxic; and (b) when allowed to escape into the open environment per the instructions given by the manufacturer, PFOA and PFOS migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

50.     At all relevant times, Defendants also knew or should have known that PFOA and PFOS present a risk to human health and could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.

51.     In 1980, 3M published data in peer reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated that it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.[6]

---

[6] *See* Letter from 3M to Office of Pollution Prevention and Toxics, EPA titled "TSCA 8e Supplemental Submission, Docket Nos. 8EHQ-0373/0374 New Data on Half Life of Perfluorochemicals in Serum," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

52.    By the early 1980s, the industry suspected a correlation between PFOS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

53.    In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[7]

54.    Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned, "we must view this present trend with serious concern. It is certainly possible that [...] exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[8]

55.    Notwithstanding their respective  knowledge of the dangers of AFFF made with PFAS, Defendants negligently and carelessly: (1) designed, manufactured, marketed, and/or sold PFAS-containing products including AFFF; (2) failed to warn users of PFAS-containing products about the presence of, and emission of, PFOA and PFOS from those products; (3) issued instructions on how AFFF should be used and disposed of (namely, by washing the foam into the soil), thus improperly permitting PFAS to contaminate the soil and groundwater in and around the Airport; (4) failed to recall and/or warn users of PFAS-containing products including AFFF of the dangers of soil and groundwater contamination as a result of the standard use and disposal of these products; (5) negligently designed products containing or degrading into PFAS;

---

[7] *See* Memorandum "C-8 Blood Sampling Results, Births and Pregnancies," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.
[8] *See* Memorandum "Organic Fluorine Levels," August 31, 1984, available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

and, (6) further failed and refused to issue the appropriate warnings and/or recalls to the users of AFFF containing PFAS, notwithstanding the fact that Defendants knew the identity of the purchasers of those products.

56.    As a direct result of Defendants' acts alleged in this Complaint, Plaintiff's Property has been contaminated and will continue to be contaminated with PFAS, creating an environmental and public health hazard, unless such contamination is remediated. As a direct and proximate result, Plaintiff must assess, evaluate, investigate, monitor, remove, clean up, correct, and remediate PFAS contamination on its property at significant expense, loss and damage.

57.    Defendants had and breached their duty to evaluate and test such products adequately and thoroughly to determine their environmental fate and transport characteristics and potential human health and environmental impacts before they sold such products.  They also had and breached their duty to minimize the environmental harm caused by PFAS. Moreover, defendants failed to warn Plaintiff of the known risks for environmental and health hazards arising from using PFAS-containing products including AFFF in their intended manner for their intended purposes.

## D.    THE IMPACT OF PFOA AND PFOS ON PLAINTIFF'S PROPERTY

58.    PFAS, including but not limited to PFOA, PFOS, and PFHxS, have been detected in varying amounts, at varying times on Plaintiff's Property.

59.    Plaintiff contends that any detectible level of PFAS in its soil, surface water, groundwater, well water, or elsewhere on its property requires investigation, remediation and monitoring.

60.     The detection and/or presence of PFAS, including PFOA and PFOS, and the threat of further detection and/or presence of PFOA and PFOS, in the Plaintiff's Property in varying amounts and at varying times has resulted, and will continue to result, in significant injuries and damage to Plaintiff.

61.     Upon information and belief, the invasion of Plaintiff's Property with PFAS is recurring—new contamination flows regularly and constantly through the groundwater and into Plaintiff's Property each day, resulting in new harm to the property and Plaintiff on each occasion.

62.     The injuries to Plaintiff caused by Defendants' conduct constitute an unreasonable interference with, and damage to, the Plaintiff's Property. Plaintiff's interests in protecting its property constitute a reason for seeking damages sufficient to restore such property to its pre-contamination condition.

## FIRST CAUSE OF ACTION

## PUBLIC NUISANCE

63.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

64.     Defendants manufactured, distributed, marketed, and promoted PFAS-containing products including AFFF in a manner that created or participated in creating a public nuisance that is harmful to health and obstructs the free use of Plaintiff's Property.

65.     The presence of PFAS interferes with the use of Plaintiff's Property as a source of drinking water supply.

66.     The presence of PFAS causes significant costs, inconvenience and annoyance to Plaintiff, who is charged with supplying potable drinking water to residences, schools, businesses, churches, and public buildings in the Town.

67.     The condition affects a substantial number of people in the community who rely upon Maysville to provide water for residential, commercial, and recreational purposes and interferes with the rights of the public at large to clean and safe drinking water resources and environment.

68.     An ordinary person would be reasonably annoyed or disturbed by the presence in public drinking water of toxic PFAS that endanger human health and degrade water quality.

69.     The seriousness of the environmental and human health risk far outweighs any social utility of Defendants' conduct in manufacturing PFAS and PFAS-containing products and concealing the dangers posed to human health and the environment.

70.     Maysville has suffered and will continue to suffer harm that is different from the type of harm suffered by the general public, and Plaintiff has incurred substantial costs to remove PFAS from its water supply.

71.     Plaintiff did not consent to the conduct that resulted in the contamination of Maysville's Property.

72.     Defendants' conduct was a substantial factor in causing the harm to Plaintiff.

73.     Defendants knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PFAS-containing products was causing the type of contamination now found in and around Plaintiff's Property.  Defendants knew that PFAS would contaminate water supplies and are associated with serious illnesses and cancers in humans. Defendants thus

knew, or should have known, that PFAS contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of public water supply wells.

74.     As a direct and proximate result of Defendants' creation of a public nuisance, Plaintiff has suffered, and continues to suffer, monetary damages to be proven at trial.

75.     Defendants' conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they manufactured, promoted, sold, and supplied PFAS-containing products including AFFF, knowing that these products would release PFAS that are toxic, cannot be contained, and last for centuries.

## SECOND CAUSE OF ACTION

## PRIVATE NUISANCE

76.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

77.     Plaintiff's Property has been contaminated by PFOA and/or PFOS as a direct and proximate result of the acts and omissions of Defendants as set forth above.

78.     PFAS contamination is a substantial and unreasonable interference with the use of Maysville Property to provide potable drinking water.  The chemicals contaminate Plaintiff's Property and threaten the health of everyone in the community who relies upon Mayfield to provide potable water.

79.     PFAS contamination caused by Defendants' conduct has damaged Plaintiff's Property and interfered with the ordinary safety, use, benefit, and enjoyment of Plaintiff's property.

## THIRD CAUSE OF ACTION

## PRODUCTS LIABILITY- INADEQUATE DESIGN (G.S. § 99B-6)

80.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

81.     Maysville was harmed by PFAS-containing products including AFFF which were designed, manufactured, sold, and distributed by Defendants, and which were defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

82.     The design of Defendants' PFAS-containing products were defective because, at the time of the products' manufacture, Defendant acted unreasonably in designing or formulating the product, and this conduct was a proximate cause of the Plaintiff's harm.

83.     In addition, at the time the products left Defendants' control, each Defendant unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design or formulation that could then have been reasonably adopted and that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the product.

84.     Moreover, at the time the product left Defendants' control, the design or formulation of the product was so unreasonable that a reasonable person, aware of the relevant facts, would not use or consume a product of this design.

85.     The design of Defendants' PFAS-containing products caused harm to Maysville.

86.     The design of Defendants' PFAS-containing products was a substantial factor in causing harm to Maysville.

87.     The gravity of the huge environmental harm resulting from the use of Defendants' PFAS-containing products was, is, and will be enormous because PFAS contamination is widespread, persistent, and toxic.

88.     The likelihood that this harm would occur was, is, and will be very high because Defendants knew and/or should have known that Defendants' PFAS-containing products were toxic, could not be contained, and do not readily degrade in the environment.

89.     Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

90.     Defendants, their officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## FIFTH CAUSE OF ACTION

## PRODUCTS LIABILITY- FAILURE TO WARN (G.S. § 99B-5)

91.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

92.     Maysville was harmed by PFOA, PFOS, and other PFAS-containing products that Defendants designed, manufactured, sold, and distributed.

93.     Defendants' PFAS-containing products were designed, manufactured, sold, and distributed without adequate warning of toxicity, potential human health risks, and environmental hazards.

94.     Defendants' PFAS-containing products were designed, manufactured, sold, and distributed without instructions to prevent contamination of soil and water and the resulting potential human health risks and environmental hazards.

95.     The potential environmental hazard and toxicity risks of Defendants' PFAS-containing products were known and/or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community and/or in light of Defendants' superior knowledge about their products at the time of design, manufacture, sale, and distribution.

96.     The potential environmental hazard and toxicity risks presented an unreasonably dangerous condition when Defendants' PFAS-containing products were and are used or misused in an intended or reasonably foreseeable way, and Defendants knew that this condition posed a substantial risk of harm to reasonably foreseeable users and bystanders including public water providers like Maysville.

97.     The risks of PFAS are not a matter of common knowledge.  Ordinary consumers and third-parties would not have recognized the potential risks.

98.     Defendants failed to adequately warn or instruct of the potential risks.

99.     Maysville was, is, and will be harmed.

100.     The lack of sufficient instructions or warnings was a substantial factor in causing Maysville's harm.

101.     Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

102.     Defendants, their officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## SIXTH CAUSE OF ACTION

### NEGLIGENCE

103.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

104.     Defendants designed, manufactured, sold, and distributed PFAS-containing products.

105.     Defendants' PFAS-containing products were designed, manufactured, sold, and distributed without adequate warning of toxicity, potential human health risks, and environmental hazards.

106.     Defendants' PFAS-containing products were designed, manufactured, sold, and distributed without instructions to prevent contamination of soil and water and the resulting potential human health risks and environmental hazards.

107.     Defendants were negligent by not using reasonable care to warn or instruct about the risks associated with PFAS-containing products.

108.     Defendants knew or reasonably should have known that their PFAS-containing products were dangerous or likely to be dangerous when used or misused in a reasonably foreseeable manner.

109.     Defendants knew or reasonably should have known that users and third parties would not realize the danger.

110.    At all times, it was reasonably foreseeable to Defendants that when used as intended, PFAS-containing products would cause contamination of soil and water and would present risks to human and environmental health.

111.    Defendants failed to adequately warn of the danger or instruct on the safe use of PFAS-containing products.

112.    A reasonable chemical manufacturer, seller, distributor, under the same or similar circumstances would have warned of the danger or instructed on the safe use of PFAS-containing products.

113.    Maysville was, is, and will be harmed.

114.    Defendants' failure to warn or instruct proximately caused Maysville's harm.

## SEVENTH CAUSE OF ACTION

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (G.S. § 25-2-314)

115.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

116.    At all relevant times, Defendants were in the business of designing, manufacturing, selling, and distributing PFAS-containing products such as those at issue here.

117.    Defendants warranted that their PFAS-containing products are merchantable.

118.    Defendants designed, manufactured, sold, and distributed PFAS-containing products without adequate warning of toxicity, potential human health risks, and environmental hazards.

119.    Defendants' PFAS-containing products were defective or otherwise unmerchantable when they left Defendants' control.

120.    When used for the ordinary purposes for which such PFAS-containing products were used and intended, PFAS-containing products were defective or otherwise unmerchantable because PFAS compounds escaped from those products, causing contamination of soil and water and presenting risks to human and environmental health.

121.    Defendants breached their implied warranty of merchantability because the goods are not fit for the ordinary purposes for which such goods are used.

122.    Defendants breached their implied warranty of merchantability because the PFAS-containing products were not packaged and labeled with the appropriate warnings about contamination and resulting health risks or with instructions that would have prevented the contamination.

123.    Defendants became aware of the human health risks and environmental dangers presented by PFAS-containing products by no later than the year 2000.

124.    Maysville was, is, and will be harmed.

125.    Defendants' breach of the implied warranty of merchantability proximately caused Maysville's harm.

126.    Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

127.    Defendants, their officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## EIGHTH CAUSE OF ACTION

## TRESPASS

144.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

145.    Maysville owns and operates real property including drinking water production wells that draw from groundwater aquifers and associated pumping, storage, treatment and distribution facilities and equipment.  Maysville has significant property interests in the waters it appropriates and uses, in its distribution infrastructure, and also has significant property interests in the groundwaters that supply its Wells.

146.    Defendants intentionally, recklessly, and negligently caused PFAS to enter into the groundwaters, aquifers, and drinking water production wells operated by Maysville.

147.    Maysville did not give permission for the entry.

148.    Maysville was, is, and will be actually harmed by the entry of PFAS onto its property.

149.    Defendants' conduct proximately caused Maysville's harm.

150.    Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

151.    Defendants, their officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## NINTH CAUSE OF ACTION

## CIVIL CONSPIRACY

152.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

153.    At all times relevant to this lawsuit, Defendants actually knew of the hazards that PFOA and PFOS posed to the environment, including Plaintiff's Property.

154.    Beginning in the 1960s and continuing through the date of the filing of this Complaint, Defendants agreed to engage in unlawful and wrongful acts that caused damage to the Plaintiff.  Each Defendant performed at least one overt act in furtherance of this conspiracy. Specifically, Defendants colluded for the avowed purpose of providing information about AFFF products containing PFOA and/or PFOS to the public and the government, with the true, unlawful purpose of:

   a.  intentionally misrepresenting to the EPA and the public that AFFF containing PFOA and/or PFOS was safe and did not pose a risk to human health and the environment;

   b.  concealing the dangers of AFFF containing PFOA and/or PFOS, including the products' characteristics and their propensity to contaminate soil and groundwater, from the government and public by, among other means, repeatedly misrepresenting how products containing PFOA and/or PFOS were being disposed of;

   c.  concealing the dangers of PFOA and/or PFOS from consumers and the public; and

      d.  using their considerable resources to fight legislation concerning PFOA and

         PFOS.

155.    As a direct and proximate result of Defendants' conspiracy, Defendants' AFFF products at all times relevant to this litigation have:

      a.  posed and continue to pose a threat to Plaintiff's Property;

      b.  contaminated and will continue to contaminate Plaintiff's Property;

      c.  contaminated and will continue to contaminate the soil, surface and groundwater on and within the vicinity of Plaintiff's Property;

      d.  required and will continue to require testing and monitoring of Plaintiff's Property for PFOA and PFOS contamination;

      e.  required or will require remediation of PFOA and PFOS contamination or, where remediation is impracticable or insufficient for Plaintiff, removal and disposal of the contamination;

      f.  diminished Plaintiff's confidence in, and the use and enjoyment of, Plaintiff's Property;

      g.  diminished Plaintiff's Property value due to actual, impending, and/or threatened PFOA and PFOS contamination; and

      h.  caused and/or will cause Plaintiff to sustain substantially increased damages and expenses resulting from the loss of the safety, use, benefit and/or enjoyment of its property.

## TENTH CAUSE OF ACTION

## FRAUDULENT TRANSFER (DUPONT AND CHEMOURS)

156.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

157.    Plaintiff seeks equitable and other relief pursuant to the Uniform Fraudulent Transfer Act against DuPont.

158.    Upon information and belief, in February 2014, DuPont formed The Chemours Company as a wholly-owned subsidiary, and used it to spin off DuPont's "Performance Chemicals" business line in July 2015.

159.    Upon information and belief, at the time of the spinoff, DuPont's Performance Chemicals division contained the AFFF and/or PFAS business segments.  In addition to the transfer of the Performance Chemicals division, Chemours accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFAS.

160.    Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture and sale of PFAS compounds and products that contain PFAS compounds.

161.    Upon information and belief, as a result of the transfer of assets and liabilities described in this Complaint, DuPont limited the availability of assets to cover judgements for all of the liability for damages and injuries from the manufacture and sale of PFAS compounds and products that contain PFAS compounds.

162.     Upon information and belief, DuPont has (a) acted with intent to hinder, delay and defraud parties, or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) was engaged or was about to engage in a business for which the remaining assets of Chemours were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

163.     Upon information and belief, DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties, such as the Plaintiff, that have been damaged as a result of DuPont's actions as described in this Complaint.

164.     Upon information and belief, DuPont and Chemours acted without receiving a reasonably equivalent value in exchange for the transfer of obligations, and DuPont believed, or reasonably should have believed, that it would incur debts beyond Chemours' ability to pay as they became due.

165.     Plaintiff seeks to avoid the transfer of DuPont's liabilities for the claims brought in this Complaint and to hold DuPont jointly and severally liable for any damages or other remedies that may be awarded by this Court or a jury under this Complaint.

166.     Plaintiff further reserves such other rights and remedies that may be available to it as may be necessary to fully compensate Plaintiff for the damages and injuries it has suffered as alleged in this Complaint.

## PUNITIVE DAMAGES

167.     Under the applicable laws of the State of North Carolina, Plaintiff seeks Punitive damages due to the wanton and willful acts and/or omissions of Defendants as set forth and alleged throughout this Complaint.

## PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1.    Compensatory damages according to proof including, but not limited to:

a.    costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent of PFAS contamination on and within Plaintiff's Property;

b.    costs and expenses related to the past, present, and future treatment and remediation of PFAS contamination of Plaintiff's Property or, in the alternative, the costs and expenses associated with and related to the removal and disposal of the contamination; and

c.    costs and expenses related to the past, present, and future installation and maintenance of monitoring mechanisms to assess and evaluate PFAS on and within Plaintiff's Property.

2.    Punitive damages;

3.    Consequential damages;

4.    Costs, disbursements and attorneys' fees of this lawsuit;

5.    Pre-judgment and post-judgment interest; and

6.    Any other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial.

Dated: December 10, 2019

Respectfully submitted,

_Scott Summy_

Scott Summy
(Texas Bar No. 19507500)
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100

Dallas, TX 75219-4281
Telephone: (214) 521-3605
Fax: (214) 520-1181
Cary McDougal
(Texas Bar No. 13569600)
Carla Burke Pickrel
(Texas Bar No. 13569600)
M. Cristina Sanchez
(Texas Bar No. 24041856 )